CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

MAR 21 2006

JOHN F CORCORAN, CLERK
BY: K Botson
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### HARRISONBURG DIVISION

| | | |
|---|---|---|
| KAREN S. THORNTON | ) | |
| | ) | |
| Plaintiff | ) | Civil Action No. 5:05cv00055 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security | ) | By:  Hon. James G. Welsh |
| | ) |       United States Magistrate Judge |
| Defendant | ) | |

Plaintiff, Karen S. Thornton, brings this action pursuant to 42 U.S.C. § 405(g) challenging a final decision of the Commissioner of the Social Security Administration ("the agency") denying her claim for a period of disability insurance benefits ("DIB") under Title II of the Social Security Act, as amended, ("the Act"), 42 U.S.C. § 416.  Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g).

By order of referral entered November 18, 2005, this case is before the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  On November 18, 2005, the Commissioner also filed her Answer and a certified copy of the Administrative Record ("R."), which included the evidentiary basis for the findings and conclusions set forth in the Commissioner's final decision.  No brief was filed by the plaintiff addressing the basis for her contention that the Commissioner's decision is not supported by substantial evidence

or why the decision should be otherwise reversed or remanded.[1]  Likewise, plaintiff has made no

written request for oral argument.[2]

***Commissioner's Motion to Dismiss***

On March 13, 2006, the Commissioner filed a motion seeking dismissal on the basis of

plaintiff's noncompliance with this court's Standing Order No. 2005-2 and an attendant failure by

her attorney to prosecute her appeal.

Given the particulars of this case, the undersigned believes dismissal to be too severe a

sanction.  As the Fourth Circuit wrote in *Reizakis v. Loy*, 490 F.2d 1132, 1135 (1974):

> A district court unquestionably has authority to grant a motion to dismiss for want
> of prosecution.  Fed. R. Civ. P. 41(b).  Indeed, . . . the trial court can take such
> action on its own motion.  But courts interpreting the rule uniformly hold that it
> cannot be automatically or mechanically applied.  Against the power to prevent delays
> must be weighed the sound public policy of deciding cases on their merits.  (Citation
> omitted).  Consequently, dismissal "must be tempered by a careful exercise of
> judicial discretion." *Durgin v. Graham*, 372 F.2d 130, 131 (5th Cir. 1967). While the
> propriety of dismissal ultimately turns on the facts of each case, criteria for judging
> whether the discretion of the trial court has been soundly exercised have been stated
> frequently. Rightfully, courts are reluctant to punish a client for the behavior of his
> lawyer. *Edsall v. Penn Central Transportation Co.*, 479 F.2d 33 35 (6th Cir. 1973).
> Therefore, in situations where a party is not responsible for the fault of his attorney,
> dismissal may be invoked only in extreme circumstances.  *Industrial Building
> Materials, Inc. v. Interchemical Corp.*, 437 F.2d 1336, 1339 (9th Cir. 1970). Indeed,
> it has been observed that "the decided cases, while noting that dismissal is a

---

[1] Pursuant to paragraph 1 of the court's Standing Order No. 2005-2, the plaintiff in Social
Security must file, within thirty a days after service of the administrative record, "a brief addressing why
the Commissioner's decision is not supported by substantial evidence or why the decision otherwise
should be reversed or the case remanded."  Although the plaintiff has not complied with this pleading
requirement, her Complaint sets forth with some specificity the reasons she believes the Commissioner's
final decision is legally deficient.  In addition, her Complaint references the court to several cases, albeit
without proper citations, which she contends support her position.  In this instance, plaintiff's pleading is
deemed to be minimally in compliance with the court's Standing Order No. 2005-2.

[2] Paragraph 2 of the court's Standing Order No. 2005-2 directs that a plaintiff's request for oral
argument in a Social Security case, must be made in writing at the time his or her brief is filed.

2

discretionary matter, have generally permitted it only in the face of a clear record of delay or contumacious conduct by the plaintiff." *Durham v. Florida East Coast Ry. Co.*, 385 F.2d 366, 368 (5th Cir. 1967).

In this case, the defendant has suffered no substantive prejudice, and the Complaint sets forth with considerable specificity plaintiff's assignments of error. There has been no significant dilatory behavior by plaintiff's counsel, and nothing in the record suggests some personal responsibility by the plaintiff for any delay. Dismissal is, therefore, inappropriate in this case, and after reviewing the administrative record, the undersigned submits the following report and recommended disposition.

### *Plaintiff's Contentions on Appeal*

Plaintiff's first contention is that the Commissioner's adverse decision was the end product of multiple procedural defects which, in effect, resulted in her application being denied fair consideration. (Complaint pp.3-4) Second, she contends that the Commissioner's denial of benefits was based on a failure to consider treating source medical evidence bearing directly on the disability decision. (Complaint p.4) Her third contention is that the Commissioner's final decision is not supported by substantial evidence. (Complaint pp. 2-3)

### I. Standard of Review

The court's review is limited to a determination as to whether there is substantial evidence to support the Commissioner's conclusion that plaintiff failed to meet the conditions for entitlement established by and pursuant to the Act. If such substantial evidence exists, the final decision of the Commissioner must be affirmed. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990); *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

"Under the . . . Act, [a reviewing court] must uphold the factual findings of the [Commissioner], if they are supported by substantial evidence and were reached through application

3

of the correct legal standard. " *Mastro v. Apfel*, 270 F3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). This standard of review is more deferential than *de novo*. "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Mastro*, 270 F.3d at 176 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642). "In reviewing for substantial evidence, [the court should not] undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Id*. (quoting *Craig*, 76 F.3d at 589). The ALJ's conclusions of law are, however, not subject to the same deferential view and are to be reviewed *de novo*. *Island Creek Coal Company v. Compton*, 211 F.3d 203, 208 (4th Cir. 2000).

## II.    Administrative History

The record shows that plaintiff protectively filed her application for DIB on or about June 21, 2002, alleging disability as of January 1, 2000, based on fibromyalgia and on multiple residual effects of having earlier contracted Lyme disease and of having sustained head and neck injuries in a past motor vehicle accident. (R.63,69,88) In particular, plaintiff stated that these conditions caused her chronic fatigue, memory deficits, back and neck pain, migraine headaches, and an impaired immune system. (R.69,88)

Her claim was denied both initially and on reconsideration. (R.43-45,46,47-49,50-51,52-54) Pursuant to a timely request, an administrative hearing on plaintiff's application was held on May 19, 2004 before an administrative law judge ("ALJ"). (R.54-57,58-62,22-26,28-42) At the hearing, plaintiff was represented by counsel. (R.27,28-42) After the hearing, and pursuant to leave granted by the ALJ, the written answers of Dr. Mark Galbraith, plaintiff's primary care physician, were submitted for consideration. (R.191,194-199)

4

Utilizing the agency's standard five-step inquiry,[3] plaintiff's claim was denied by written decision dated August 20, 2004. Therein, the ALJ found that plaintiff met the Act's insured status requirements, at least through the date of the decision, and that plaintiff had not engaged in substantial gainful activity since January 1, 2000, the alleged disability onset date. (R.16.20) The ALJ's step-two findings were that the medical evidence established that plaintiff had certain medical problems which could cause significant vocationally relevant limitations and were "severe" impairments[4] within the meaning of the Act, namely cervical spondylosis, fibromyalgia, depression and the residuals effects of Lyme disease. (R.18,20)

At step-three, the ALJ concluded that plaintiff's impairments (either individually or in combination) neither met nor were medically equivalent to an impairment listed in 20 C.F.R. Par 404, Subpart P, Appendix 1. (R.18,20) In particular, he concluded that the plaintiff's impairments neither met nor equaled the criteria of Listing 1.04 (disorders of the spine) or Listing 12.04 (affective

---

[3] Determination of eligibility for social security benefits involves a five-step inquiry. *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). It begins with the question of whether the claimant engaged in substantial gainful employment. 20 C.F.R. § 404.1520(b). If not, step-two of the inquiry is a determination whether, based upon the medical evidence, the claimant has a severe impairment. 20 C.F.R. § 404.1520(c). If the claimed impairment is sufficiently severe, the third-step considers the question of whether the claimant has an impairment that equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations. 20 C.F.R. § 404.1520(d); 20 C.F.R. Part 404, subpart P, App.I. If so, the claimant is disabled; if not, step-four is a consideration of whether the claimant's impairment prevents him or her from returning to any past relevant work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a). If the impairment prevents a return to past relevant work, the final inquiry requires consideration of whether the impairment precludes the claimant from performing other work. 20 C.F.R. § 404.1520(f).

[4] Quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984), the Fourth Circuit held in *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984), that "an impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.'" *See also* 20 C.F.R. § 404.1520(c).

disorders), and he noted that no treating or examining physician had mentioned findings equivalent to the criteria in any listed impairment. (R.18)

After further concluding that plaintiff's allegations concerning her limitations were not fully supported in the medical record, the ALJ found that plaintiff retained the exertional ability to perform work which required her to stand/walk for six hours in an eight-hour work day, to sit for six hours in an eight-hour work day with the option of standing or sitting at will, to lift twenty pounds occasionally, to lift ten pounds regularly, and to have postural limitations which included no climbing of ladders or ropes and only occasional climbing of ramps or stairs. (R.19,20)

The ALJ's opinion does not show clearly a step-four conclusion that these functional limitation would prevent plaintiff from performing her past relevant work as a secretary;[5] however, the ALJ's step-five reliance on the testimony of a vocational witness and his inclusion of a volitional sit/stand[6] option in his hypothetical question, implies a finding that work at this restricted level of exertion would not permit plaintiff to perform her past relevant work as a secretary. *See Pass v. Chater*, 65 F.3d 1200, 1204 (4th Cir. 1995) ("Only at step five does the existence of job opportunities become relevant").

Relying on the vocational testimony, the ALJ determined that plaintiff could perform the requirements of a number of jobs existing in the national economy, including work as a data recorder

_____

[5] Plaintiff completed a Disability Report (R.68-77), dated June 21, 2002, in which she identified two types of jobs that she had performed during the preceding fifteen years. She stated that she had worked as a secretary ("computer work - answering the phone etc.") on a full time basis from 1981 to the "present" and that she had worked as store "associate" one day per week for the preceding three months. (R.70) At the administrative hearing two years later, plaintiff testified that her recent work had all been part-time either as a cake decorator or doing data collection at the local court house. (R.32-33)

[6] The opportunity to change positions during the performance of work activity is typically described as the "sit/stand option" or sit/stand limitation." *See Gibson v. Heckler*, 762 F.2d 1516, 1518(11th Cir. 1985).

(a job she was doing on a part-time basis at the time of the hearing), work as a general office helper, work as a router/dispatcher, and work as a cashier II. (R.19-20)

After the ALJ's issuance of his adverse decision, plaintiff made a timely request for review by the Appeals Council. (R.200). This request was subsequently denied (R.6-8), and the ALJ's unfavorable decision now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981.

### III.    Facts

In rendering his decision, the ALJ reviewed plaintiff's medical records from Selma Medical Associates (R.115-131, 138-139,197-199), from Front Royal Internal Medicine (R.132-145, 174), from Psychiatric Health Associates R.146-147), from Winchester Medical Center (R.176,180), and from Winchester Neurological Consultants (R.148-151,175,177-179,188-190). In addition, the ALJ considered the medical assessments of the state agency physician (R166-173,181-187) and psychologist (R.152-165). There is no indication in the record, however, that the answers of Dr. Mark Galbraith, plaintiff's primary care physician, to certain written interrogatories (R.194-199) were considered by the ALJ.

The earliest medical information considered by the ALJ was from Selma Medical Associates. Therein, Dr. Galbraith noted that February 26, 1999 was the first time that he had seen the plaintiff since September 1997. (R.124) He noted that the plaintiff had a medical history which included treatment for Lyme disease, hypoglycemic reactions and fibromyalgia. *Id.* On examination, her hands showed "mild" degenerative changes without swelling; she had a facial rash that appeared to be a "flare of her rosacea," and she had some evidence of hypoglycemia "due to poor diet." *Id.* Dr. Galbraith further noted that the plaintiff did not appear either to have diabetes or to need further therapy for Lime disease. *Id.*

7

When Dr. Galbraith next saw the plaintiff in September 1999, she reported having had a MRI done which showed early herniated discs. (R.123) On examination, Dr Galbraith found the plaintiff to have intact range of motion and no trigger points. *Id*. Dr. Galbraith saw plaintiff for a third time in 1999 at the end of December. On that occasion, she was treated for a complaint of sinus congestion related to an upper respiratory infection. (R.122) Although she appeared to be in no acute distress, on this occasion the plaintiff also complained of intermittent shoulder pain which she attributed to a motor vehicle accident. *Id*.

Two weeks later, the plaintiff was again seen for problems associated with her respiratory infection, including coughing, nausea, weakness, fever, aches and chills. (R.121) Six months later, she presented with complaints of visual changes and continuing joint pain. (R.120) After noting that plaintiff's medical history included an atypical blood abnormality in 1987, past treatment for Lyme disease, a recent (and now resolved) respiratory illness, past involvement in a motor vehicle accident, blurred vision after being struck in the eye with a piece of cardboard and headaches associated with vision problems, Dr. Galbraith clinically concluded that plaintiff's vision problems might be migraine equivalent and that she was probably still affected by a bone marrow suppression related to her recent viral condition. *Id*.

More than ten months passed before the plaintiff again saw Dr. Galbraith. On that occasion, she saw the doctor for a "yearly evaluation because of fatigue and [labored breathing]." (R.118) In connection with this office visit, Dr. Galbraith noted that a blood work-up in June 2000 was negative, that the plaintiff had recently returned from Florida with a fever and shortness of breath, and that she had been seen three days previously in the local hospital's ER with complaints of pleuritic chest pain and wheezing. (R.118) He noted that her hypoglycemia was controlled, that her

8

rosacea was controlled with medication, that her wheezing was gone, that she had no shortness of breath, that she appeared to be in "no distress," and that she had inadvertently taken an overdose of prednisone the preceding day. (R.118-119) In addition, he noted her history of migraine headaches and "myositis/fibromyalgia." (R.119)

Two days later, the plaintiff presented with complaints of myalgias, a fever during the preceding day, and hearing difficulties. (R.117) She was found to be alert and oriented with no edema or swollen joints. *Id.* Two weeks later she complained to the doctor that full-time work adversely impacted her health, leading to loss of time and ultimately job loss. (R.116) Nevertheless, she reported that she was feeling much better, that her sore throat had resolved, that her aches and pains had resolved, that she experienced some shortness of breath climbing stairs, but that she was otherwise doing well. *Id.*

When the plaintiff next saw Dr. Galbraith on September 7, 2001, she stated that she was feeling better but was concerned about possible high or low blood sugar levels. (R.115) She informed the doctor that she was not going to return to her job in a dentist's office because of the ten-hour days, but that she was planning to take another job. *Id.* Dr. Galbraith noted that she was alert, oriented, and in no distress. *Id.* His office note record of this visit contains no indication that he viewed plaintiff's proposed work plans were medically contraindicated.

On the basis of plaintiff's expressed concern about possible hypoglycemia (low blood sugar), she was referred to Dr. Patricia Daly, an internist at Front Royal Internal Medicine. (R.144) When seen by Dr. Daly on October 16, 2001, plaintiff gave a history of having first experience an incident of reactive hypoglycemia in 1986 which was controlled "fairly well" with avoidance of sugar and increased protein intake. *Id.* She reported that she was working at an auto body shop doing

9

paperwork. *Id.* She also reported no recent weight change, fatigue, sleep disturbance [or] other symptoms of hypoglycemia, and she denied any headache, vision, hearing, voice, or significant ENT symptoms, except headaches when the weather changed. (R.144) On examination Dr. Daly found the plaintiff to be a "well-nourished, well-appearing, thin woman in no acute distress." (R.145) The advice of a dietician was recommended, and the plaintiff later reported that she found the dietary advice to be helpful. (R.145, 142)

Complaining of dizziness, a lack of energy, an inability to concentrate well, difficulty sleeping and "family problems," Dr. Daly next saw the plaintiff on November 27, 2001. (R.142) She clinically diagnosed the plaintiff to be experiencing depression, and she "encouraged" the plaintiff to discuss it with Dr. Galbraith, her primary care physician. *Id.* Three weeks later the plaintiff called Dr. Daily with a complaint of two episodes of dizziness; she was advised to call if the problem reoccurred. *Id.*

Instead of scheduling an appointment with her primary care physician for treatment of the depression, plaintiff elected to return to see Dr. Daily on January 18, 2002. (R.141) At that time she told the doctor that she felt "down all of the time," irritable, not to be sleeping well, and to be experiencing more leg cramps. *Id.* Paxil, in addition to amitryptyline, was prescribed. *Id.*

Over the course of the next eleven months, the plaintiff saw Dr. Daly three additional times, and she saw her primary care physician once. (R.140,137,133,138-139)

On March 22 she told Dr. Daly that she never started the Paxil regime that had been prescribed, that she had stopped working full-time because of "insomnia," and that she continued to feel tired, to lack motivation, and to experience problems with concentration and memory. (R.140) Dr. Daly described the plaintiff as "well-appearing but depressed," as having "many somatic

10

complaints" which were possibly exacerbated due to depression and sleep deprivation, and without any need for a neurologic evaluation. *Id*. When she saw Dr. Galbraith the following month, on April 26, the focus of her health concerns were with perceived cognitive and memory dysfunction she related to having contracted Lyme disease in 1994. (R.138-139) On examination Dr. Galbraith found the plaintiff to be alert, oriented, and coherent. *Id*. He "discussed . . . with her . . . that she [would] need to have neuropsychiatric testing" to confirm a diagnosis that any cognitive or memory problems were related to her having had Lyme disease in the past. *Id*.

Two months later, on June 26, the plaintiff reported to Dr. Daly that her depression was "improved," that she had been experiencing some neck pain which had been helped by chiropractic treatment, and that she was now able to work two part-time jobs. (R.137) In connection with this office visit, Dr. Daly noted that the plaintiff was "well-appearing" with some decrease in her neck range-of-motion and with no current desire to seek counseling for her depression and anxiety. *Id*. When next seen by Dr. Daly on August 26, the plaintiff told the doctor that her anxiety and depression had increased since she had stopped taking anti-depressants, but she declined to resume a medication treatment regime. (R.133) On this occasion plaintiff also reiterated a number of her previous complaints, including sleep difficulties, dizziness, fatigue, irritability, muscle pain, cognitive difficulties, and breathing difficulties on exertion. *Id*. Because of her expressed concerns about possibly having leukemia, Dr. Daly encouraged her to schedule an appointment with a neurologist. *Id*.

On September 9, 2002, the plaintiff underwent psychiatric testing at Psychiatric Health Associates to determine the cause of her perceived memory problems. (R.146) After testing, no organic basis for any memory impairment was disclosed. *Id*. Plaintiff's memory test scores were

11

"clustered around the average range;" her general memory was "solidly within the average range," and the testing measures of attention and concentration were "in the upper part of the average range." *Id.* During the psychologist's post-testing discussion with the plaintiff, she acknowledged having been told by others that her stress, anxiety and depression were the probable reason her memory was not what she felt it should be. (R.147) Once again counseling was suggested. *Id.*

On October 22, 2002, the plaintiff had a neurological examination at Winchester Neurological "for neck pain." (R.148) In connection with this evaluation, the plaintiff gave a history of having Lyme disease in 1995, of having been involved in a motor vehicle accident in 1984, of having had some chronic neck pain since this accident, of having hurt her neck unloading a truck while working as a cake decorator, of having joint and muscle aches and of having "occasional headaches, as well as face twitching." (R.149) On examination, no weakness in any muscle group was found; no neck muscle weakness was found, and no significant radiation of neck pain was found. (R.149-150)

On January 10, 2003, the plaintiff saw Dr. Daly for a final time. At the time of this office visit, plaintiff reported that she had stopped taking any medication, that she felt generally fatigued, and that her muscles hurt all of the time. (R.174) Dr. Daly found her to be "well-appearing" and discussed with her the need both to seek counseling and to consider medications to decrease her symptoms. *Id.*

Subsequent neurological testing resulted in "abnormal" EEG test results showing epilepsy of left centraparietal origin, of unknown etiology, and without reported seizure activity. (R.175,177,189) A neck MRI on February 4, 2003 disclosed "mild multilevel spondylosis from C3-4 to C6-7 with associated posterior disc bulging" (R.176), and a pharmacological regime of Tegretol

12

was suggested (R.178-179). A head MRI on March 25, 2003 was normal (R.180). And at the time of her last neurological appointment on May 22, 2003, Depacote had been prescribed for her migraine headaches, and on examination she demonstrated no evidence of a motor deficit, either on the left or the right. (R.188-190)  As the neurologist, Dr. Mark Landrio, concluded, "in short [the plaintiff] presents with a myriad of complaints . . . related to anxiety disorder . . . ." (R.190)

Prior to the administrative hearing one year later, the record indicates that the plaintiff saw a doctor only once. Her primary care physician apparently saw her on June 16, 2003; neither the reason nor the nature of any treatment was, however, given. (R.199)

After noting that the plaintiff was under the care of an endocrinologist (D. Daly) for hypoglycemia and a neurologist (Dr. Landrio) for her migraines (R.199), plaintiff's primary care physician opined in a letter dated August 1, 2003 that plaintiff's medical history made it "certainly conceivable" that she could not work on a full-time job. *Id.* Two months later Dr. Galbraith supplemented to his letter of August 1, by adding that the plaintiff also had fibromyalgia[7] and expressing the further opinion that plaintiff should avoid sitting for prolonged periods, should avoid standing for periods longer than thirty minutes,  should not lift over forty pounds, and could do clerical tasks for two hours per day. *Id.*

After nearly one year without seeking any medical care, the plaintiff saw Dr. Galbraith on May 28, 2004 (nine days after the administrative hearing). (R.197)  He found the plaintiff to be alert, oriented, and worried about being reinfected with Lyme disease. *Id.*  In his subsequent written answers to several interrogatories propounded by plaintiff's attorney, Dr. Galbraith stated that the

---

[7] In his subsequent interrogatory answers (R.194-196) Dr. Galbraith stated that his clinical diagnosis of fibromyalgia was "based on symptoms," which included a history of persistent widespread pain in all quadrants, axial skeletal pain, shoulder and buttock pain on both sides.

13

plaintiff's medical conditions limited her ability to stay on task, to concentrate, to deal with others, and to understand others. In addition, he felt that the plaintiff's condition would require work activity include both the option to sit or stand and the need to have periods of rest during a normal work day. (R.194-196)

As part of the administrative review process, available treating and examining source medical records were reviewed both by state agency psychologists (R.152-165) and physicians (R.166-173,181-187). On April 12, 2003, the psychologist concluded that the medical records failed to demonstrate a medically determinable psychiatric impairment. (R.152) Two days later, the state agency physician concluded that the plaintiff's several medical problems, including back and neck pain, low immune system, migraines, fatigue and memory complaints, limited her functional abilities to some degree. In his opinion, these conditions would permit her work at jobs that required her to lift fifty pounds occasionally, to lift twenty-five pounds frequently, to stand/walk six out of an eight-hour work day, to sit six out of an eight hour work day, to climb stairs occasionally, and required no climbing of a ladder. (R.182-183) In compliance with his regulatory obligations, their opinions and conclusions concerning plaintiff's impairments and her residual functional abilities were also considered by the ALJ as part of the decision-making process. *See* 20 C.F.R. § 404.1527(f).

At the administrative hearing, the plaintiff testified that she was then forty-one years of age (R.31), which classifies her as a "younger worker" under 20 C.F.R. § 1563(a). She testified that she has a high school education. (R.31) *See* 20 C.F.R. §§ 404.1564, 416.964. She stated that she was currently working for a couple of hours, several days each week, in her local county court house collecting data and that her most recent prior work had been as a cake decorator (R.32) She also testified that she found it difficult to drive a car. (R.33)

Robert Lester, a vocational expert, was also present at the administrative hearing. (R.38-41) In terms of exertion and skill levels, he described plaintiff's past work to be that of a secretary. (R.39) He was asked to identify work activity that could be done by a hypothetical individual who was assumed to be of plaintiff's age, education and work history, who could do work with a sit/stand option. (R.39) In response, the vocational witness testified that such an individual could perform full-time work in the national economy, and as "representative samples" he identified jobs such as general office helper, router (dispatch worker) and cashier, (R.40-41)

## IV.     Analysis

### A.     *Plaintiff's Contention that She Was Denied a Fair Administrative Hearing*

Based upon what she asserts to have been "multiple occurrences of procedural deficits," plaintiff's basic due process contention is that the ALJ denied her appropriate consideration of her disability claim. Fairly summarized, these "procedural deficits" are of two types,[8] bias on the part of the ALJ and a failure by the ALJ to follow certain HALLEX[9] guidelines.

Without question, due process principles apply to Social Security proceedings. *Perales v. Richardson*, 402 U.S. 389, 401-02 (1971). The Due Process clause of the Fifth Amendment guarantees that no deprivation of life, liberty or property will occur without notice and a fair hearing. To prevail on her due process argument, however, plaintiff must meet a two-part test. She must

---

[8] Although couched as a due process denial, plaintiff's allegation that the ALJ failed to consider her disability on the basis of fibromyalgia is more appropriately an element of her contention that the ALJ failed to consider her post-hearing evidence.

[9] HALLEX is the Hearings, Appeals and Litigation Law manual of the Social Security Administration. It contains "guiding principles, procedural guidance and information" to the agency's Office of Hearings and Appeals, and it "also defines procedures for carrying out policy and provides guidance" for administrative processing and adjudication of claims at the ALJ, Appeals Council and court review levels. HALLEX I-1-0-1.

15

establish that the Government is attempting to deprive her of a protected interest and that she did not have a "full and fair" hearing. *Id.*

In the matter now before the court, the plaintiff clearly satisfies the test's first prong, since a "social security claimant has a property interest in benefits for which . . . she hopes to qualify." *Flatford v. Chater*, 93 F.3d 1296, 1304 (6th Cir. 1996). The due process question is, therefore, simply whether the plaintiff was accorded a full and fair hearing, and the answer to that question depends, as a matter of law, on application of a three-part balancing test. *Rodgers v. Norfolk School Bd.*, 755 F.2d 59, 62 (4th Cir. 1985) (citing *Mathews v. Eldridge*, 424 U.S. 319 (1976)). In addition to requiring some form of hearing at a meaningful time and in a meaningful manner, due process requires a balancing of three considerations:

> first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Rogers v. Norfolk School Bd.*, 755 F.2d at 62 (quoting from *Matthews .v Eldridge*, 424 U.S. at 335).

## 1. *ALJ Bias*

In *Schweiker v. McClure,* 456 U.S. 188, 195 (1982), the Supreme Court made it patently clear that the constitutional requirement of due process demands impartiality on the part of those who function in judicial or quasi-judicial capacities. This court must start, however, from the presumption that the ALJ was not biased. *See Withrow v. Larkin*, 421 U.S. 35, 47 (1975); *United States v. Morgan*, 313 U.S. 409, 421 (1941). The burden is, therefore, on the party making the claim of bias to demonstrate either some conflict of interest or other specific reason for disqualification. *See Gibson v. Berryhill*, 411 U.S. 564, 578-579 (1973), *Ward v. Village of Monroeville*, 409 U.S.

16

57, 60 (1972). *See also In re Murchison*, 349 U.S. 133, 136 (1955) ("to perform its high function in the best way 'justice must satisfy the appearance of justice'") (*quoting Offutt v. United States*, 348 U.S. 11, 14 (1954)).

Plaintiff's contention that the ALJ's behavior resulted in the denial of her entitlement to a full and fair hearing is simply not supported by the record. She alleges that the ALJ "seemed unwilling to allow . . . more that a few seconds to ask and/or answer questions" and "seemed" to be disdainful of her fibromyalgia condition. Such impressions or feelings are not evidence either of bias or partiality. In evaluating plaintiff's claim of bias, this court must begin with the "presumption that policymakers with decision making power exercise their power with honesty and integrity." *Navistar Int'l. Transportation Corp. v. United States Environmental Protection Agency*, 941 F.2d 1339, 1360 (6th Cir. 1991). The burden of overcoming this "presumption of impartiality rests on the party making the assertion [of bias], and the presumption can be overcome only with convincing evidence that a risk of actual bias or prejudgment is present." *Id.* (citing *Schweiker v. McClure*, 456 U.S. 188, 196 (1982); *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)). In other words, "any alleged prejudice on the part of the decision maker must be evident from the record and cannot be based on speculation or inference." *Id.*

The plaintiff fails to meet this test. The administrative record discloses no evidence of either bias or lack of patience by the ALJ. There is simply nothing in the record to suggest that plaintiff's counsel was blocked from presenting any testimony, prohibited from asking any question, cut-off by the ALJ in mid-sentence, chastised any manner, or otherwise treated with an absence of courtesy. (R.8-11)

Case 5:05-cv-00055-SGW-JGW   Document 9   Filed 03/21/06   Page 17 of 26   Pageid#: 36

Likewise, the administrative record similarly fails to demonstrate any untoward bias, disdain, or unwarranted skepticism concerning the plaintiff's claim, her medical condition or her motivation to work. The ALJ asked the plaintiff vocationally-related questions, whether she drove an automobile, who in her household did the cleaning and cooking , how she spent an average day, whether she engaged in any community activities, and whether she was being currently treated for Lyme disease, fibromyalgia, or migraine headaches. (R.4-8) Plaintiff's counsel objected to none of these questions. Similarly, he interposed no objection to the manner in which the administrative hearing was being conducted..[10] The ALJ neither asked any improvident questions nor made any inappropriate comments. In short, there is absolutely nothing about the hearing or the ALJ's conduct which would suggest to an objective observer that the conduct of the hearing was not fair.

## 2. *HALLEX Guideline Requirements*

As a separate basis for her claim that she was denied a fair hearing, the plaintiff relies on the failure of the ALJ to follow certain guidelines contained in the Commissioner's procedural and informational manual for the agency's Office of Hearings and Appeals. *See* Hearings, Appeals and Litigation Law manual ("HALLEX") I-1-0-1. Assuming, without deciding, that the agency must follow its HALLEX guidelines, even when they are more rigorous than then constitutionally required,[11] the cited sections do not appear to be ones with regulatory import in this case. The

---

[10] In the opinion of the undersigned magistrate judge, it is a lawyer's duty to object whenever he or she feels a client's rights are not being appropriately protected. Likewise, it is a lawyer's duty to create a record sufficient for court review. Having failed to do so, there is no basis upon which to assess the materiality of any decision making error. In this case the court can only speculate on the nature and type of "protestations" of a "tacit" nature allegedly made by plaintiff's counsel during the hearing.

[11] It appears that the Ninth Circuit has concluded that HALLEX is purely an internal manual to guide the Office of Hearings and Appeals staff and does not have any legal force. *Moore v. Apfel,* 216 F.3d 864, 869 (9th Cir. 2000). In contrast, the Fifth Circuit has held that although HALLEX "does not

suggestion in Section 1-2.6-50 that the ALJ introduce himself or herself at the beginning of the case is patently not mandatory. The record contains no objection, suggestion or inference that the plaintiff's entitlement under Section I-2-6-60-C to be physically present throughout the administrative hearing was abridged. Likewise the record contains no suggestion of prejudice and no request for delay as a consequence either of the agency's failure (pursuant to Section 1-2-6-74) to provide advance notice that a vocational witness was scheduled to testify or of the ALJ's failure to invite plaintiff's counsel to stipulate the professional qualifications of the vocational witness. At the beginning of the hearing, plaintiff's counsel was provided with a copy of the vocational witness' professional résumé (R.30); the subsequent vocational testimony was, in all respects, routine (R.38-40), and counsel's cross examination suggested no testimonial surprise or procedural prejudice (R.40-41). Moreover, even if one or more of the cited HALLEX sections is deemed to be mandatory, the plaintiff points to nothing either in the manual or the regulations to suggest that a new hearing is required in this case or that the ordinary mechanism of judicial review under 42 U.S.C. § 405(g) is not adequate to cure any prejudice.

**B.** ***Plaintiff's Contention that the Agency Ignored Treating Source Medical Evidence of Disability***

As previously noted, "disability" is defined in 42 U.S.C. § 423(d)(1)(A) as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." Under the Act, the burden is on the plaintiff

---

carry the authority of law," the failure of the agency to follow its own procedures is reversible error where that failure results in prejudice to an individual. *Newton v. Apfel,* 209 F.3d 448, 459 (5th Cir. 2000).

19

to establish that she cannot work. 42 U.S.C. §§ 423(d)(5), 1382c(a)(3)(H)(I). *See also Blalock v. Richardson*, 483 F.2d 773, 774 (4ᵗʰ Cir. 1972). And pursuant to the Commissioner's longstanding regulations, in determining whether an individual is entitled to Social Security disability benefits, special weight is accorded opinions of the person's treating physician. *See* 20 C.F.R. §§404.1527(d)(2), 416.927(d)(2).

Although this treating physician rule generally requires greater weight to be accorded the statements and opinions of a treating physician, the rule does not require in all instances that such statements and opinions be given controlling weight. *See Campbell v. Bowen*, 800 F.2d 1247, 1250 (4th Cir. 1986). The ALJ may choose to give less weight to the testimony of a treating physician if there is "persuasive contrary evidence." *See Mastro v. Apfel*, 270 F.3d 171, 178 (4ᵗʰ Cir. 2001); *Foster v. Heckler*, 780 F.2d 1125, 1127 (4th Cir. 1986). In choosing to do so, the ALJ must, however, consider a treating source's opinion concerning the impairment's nature and severity, whether it is supported by medically acceptable clinical and laboratory diagnostic techniques, whether it is consistent with the other substantial evidence in the record. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). In this case, the ALJ failed to do so.

Dr. Galbraith had a long-term treating relationship with the plaintiff, and he had examined her on multiple occasions. Thus, two compelling reasons exist for the court to accord "greater weight" to the testimony this treating source. *Mastro v. Apfel*, 270 F.3d at 178. Moreover, Dr. Galbraith's testimony concerning his clinical findings fully support the diagnosis of fibromyalgia and attendant functional limitations.[12] Because the ALJ failed to properly consider this evidence,

---

[12] "Fibromyalgia is an extremely common chronic condition that can be challenging to manage. Although the etiology remains unclear, characteristic alterations in the pattern of sleep and changes in neuroendocrine transmitters . . . suggest that dysregulation of the autonomic and neuroendocrine system

remand of this case to the Commissioner for reconsideration of the decision is required. *See Riley*

*v. Apfel*, 88 F. Supp. 572, 575-578 (WDVa. 2000).

### C. Plaintiff's Contention that the Decision Is Not Supported By Substantial Evidence

A plaintiff's claim that the Commissioner's decision is not supported by substantial evidence

must be analyzed by the court pursuant to the same five-step framework applicable to every social

security disability claim. *See* 20 C.F.R. §§ 404.1520, 416.920. *See also Heckler v. Campbell*, 461

U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process asks

whether the plaintiff (1) is working, (2) has a severe impairment, (3) has an impairment which meets

or is medically equivalent to an impairment listed in Appendix I of the agency's regulations, (4) can

return to any past relevant work, and (5) if not, can perform other work. 20 C.F.R. § 404.1520. *See*

*also* 20 C.F.R. § 404.1545(a). If the final decision of the Commissioner contains a conclusive

finding at any point in this sequential process that the plaintiff either is or is not disabled, the

decisional review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a). Under this

analytical framework, the plaintiff has the initial burden of showing that she is unable to return to

her past relevant work because of her functional impairments. Once she has done so, the burden

shifts to the Commissioner to establish that the plaintiff retains the functional ability, considering

her age, education, work experience and impairments, to perform alternative work that exists in

significant numbers in the national economy. *See* 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(A)–(B);

---

appears to be the basis of the syndrome. The diagnosis is clinical and is characterized by widespread pain, tender points and, commonly, comorbid conditions such as chronic fatigue, insomnia and depression. Treatment is largely empiric, although experience and small clinical studies have proved the efficacy of low-dose antidepressant therapy and exercise. Other less well-studied measures, such as acupuncture, also appear to be helpful. Management relies heavily on the physician's supportive counseling skills and willingness to try novel strategies in refractory cases." American Family Physician 2000; 62:1575-82,1587.

*McLain v. Scjweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), setting forth the relevant standard of review, states: "The findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive." The Commissioner, and not the courts, is charged with reconciling inconsistencies in the evidence. *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

Utilizing the five-step process, the ALJ in this case concluded that plaintiff met the insured status requirements of the Social Security Act through the decision date (R.14), that she had not engaged in substantial work activity since the alleged onset of disability date (R.20), and that she had "severe"[13] impairments, namely fibromyalgia, depression, the residual effects of Lyme disease and cervical spondylosis which can cause significant vocationally relevant limitations. (R.18,20) After considering these severe impairments, the ALJ concluded that plaintiff's impairments were not of the level of severity necessary to meet or equal the requirements of an impairment defined in the Listing of Impairments (R.20). *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, Regulations No. 4). As previously noted, the ALJ make no specific step-four finding; however, his step-five reliance on the testimony of a vocational witness and his inclusion of a volitional sit/stand option in the hypothetical question, implies a finding that work at this restricted level of exertion would not permit plaintiff to perform her past relevant work as a secretary.

---

[13] In *Evans v. Heckler*, 734 F.2d 1012 (1984), the Fourth Circuit held that "'[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.'" (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)).

Case 5:05-cv-00055-SGW-JGW   Document 9   Filed 03/21/06   Page 22 of 26   Pageid#: 41

Given this finding that plaintiff's medical condition was sufficiently severe to render her unable to perform certain types of work, including her past relevant work, the specific issue presented by this third appeal contention is whether the evidence supports the Commissioner's finding that plaintiff retains the functional ability to perform one or more types of work that exists in significant numbers in the national economy. *See* 42 U.S.C. §§ 423(d)(2), 1382c(a).

In other words, the Commissioner's non-disability finding must be upheld, if it is supported by substantial evidence. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972); *Oppenheim v. Finch*, 495 F.2d at 397. Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). *See also Thomas v. Celebreeze*, 331 F.2d 541, 543 (4th Cir. 1964); *Blalock v. Richardson*, 483 F.2d, 773, 775 (4th Cir. 1972).

To determine whether substantial evidence supports the Commissioner's non-disability determination, consideration of four elements of proof is required. These include: the objective medical facts and clinical findings; the subjective evidence of physical manifestations of impairments described in plaintiff's testimony; the plaintiff's vocational profile (education, vocational history, residual skills, and age); and the opinions and conclusions of treating health care providers. *See Vitek v Finch*, 438 F.2d 1157, 1159-60 (4th Cir. 1971); *Underwood v. Ribicoff*, 298 F.2d 850, 851 (4th Cir. 1962).

It is the ALJ's failure to consider this fourth element of proof, the plaintiff argues, which compels a finding that the Commissioner's decision is not supported by substantial evidence.

To fulfill its review function, this court must have before it a record which permits an evaluation and weighing of various medical opinions pursuant to a number of factors, including

23

whether the physician has examined the applicant, the existence of an ongoing physician-patient relationship, the diagnostic and clinical support for the opinion, the opinion's consistency with the record, and whether the physician is a specialist. *See* 20 C.F.R. § 404.1527.

In the case now before the court, the administrative record in its entirety, including the functional limitations outlined by Dr. Galbraith, document an inability on the part of the plaintiff to work on a full-time basis. As plaintiff's primary care physician, Dr. Galbraith's opinion is entitled to great weight. *Mitchell v. Schweiker*, 699 F.2d 185, 187 (4th Cir. 1983). His medical opinion, based on his professional expertise, concerning the extent of the plaintiff's impairment cannot be rejected "in the absence of persuasive contrary evidence." *See Wilkins v. Secretary, HHS*, 953 F.2d 93, 96 (1991). It states unequivocally that the plaintiff became disabled prior to the date[14] of the ALJ's decision. Without a basis in the record to support it's rejection, the court is constrained to conclude that the Commissioner's decision is not supported by substantial evidence. *Id.*

## V.    Proposed Findings of Fact

As supplemented by the above summary and analysis and on the basis of a careful examination of the full administrative record, the undersigned submits the following formal findings, conclusions and recommendations:

1.    Dismissal of plaintiff's appeal pursuant to Rule 41(b) is not warranted by the facts and circumstances of this case;

2.    Plaintiff's claim that she was denied constitutionally required due process is not supported by the administrative record;

3.    The ALJ failed to consider adequately all of the evidence in this case;

---

[14] Although this treating source medical evidence demonstrates plaintiff's disability as of July 15, 2004 (R.196), the administrative record, as currently constituted, does not demonstrate an earlier disability onset date.

24

4.   The final decision of the Commissioner is not supported by substantial evidence;

5.   It is proper to reverse the Commissioner's decision and to remand the case to the Commissioner, pursuant to "sentence four" of 42 U.S.C. § 405(g), for reconsideration in a manner not inconsistent with this report and recommendation; and

6.   On remand, the parties should have the opportunity to introduce such additional evidence as they may be advised is appropriate.

## VI.   Recommended Disposition

For the foregoing reasons, it is RECOMMENDED that an order enter DENYING the defendant's motion to dismiss, VACATING the final decision, REMANDING the case to the Commissioner for further proceedings and reconsideration in a manner not inconsistent with this Report and Recommendation and with the parties to have the opportunity to introduce such additional evidence as they may desire, and DISMISSING this case from the docket of the court.

The clerk is directed to transmit the record in this case immediately to the presiding United States District Judge.

## VII.   Notice to the Parties

Both sides are reminded that, pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, they are entitled to note objections, if any they may have, to this Report and Recommendation within ten (10) days hereof. **Any adjudication of fact or conclusion of law rendered herein by the undersigned to which an objection is not specifically made within the period prescribed by law may become conclusive upon the parties**. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitals or findings as well as to the conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objections.

25

The clerk is directed to transmit copy of this Report and Recommendation to all counsel of record.

DATED: 20th day of March 2006.

_____
United States Magistrate Judge

26